UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
ARTHUR VIGIL,                           :
        Plaintiff,                      :
                                        :
             v.                         :      File No. 1:05-CV-84
                                        :
EXPRESSJET AIRLINES, INC. and           :
CONTINENTAL AIRLINES, INC.,             :
        Defendants.                     :
_____:
```

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Paper 33)

I.   Introduction

When ExpressJet Airlines, Inc. ("ExpressJet") fired

Plaintiff Arthur Vigil ("Vigil") from his job in 2004, Vigil

filed this action against ExpressJet and its former parent

company, Continental Airlines, Inc. ("Continental"), alleging age

discrimination in violation of the federal Age Discrimination in

Employment Act, 29 U.S.C. § 621, et seq. (the "ADEA") and

Vermont's Fair Employment Practices Act, 21 V.S.A. § 495, et seq.

("VFEPA"), as well as breach of an implied contract to use

progressive discipline.

Upon consideration of Defendants' pending summary judgment

motion, the Court grants summary judgment in favor of Defendants

on all counts.

II.  Factual Background[1]

    A.    Vigil begins working for ExpressJet

    Vigil had enjoyed a nearly twenty-seven year career with

Continental.  During this tenure, Vigil received performance

evaluations ranging from "outstanding" to "on target."  (Paper

47, Ex. 3).  In April of 2002, ExpressJet, previously a wholly-

owned division of Continental, became an independent, publicly

traded company.  Based upon this restructuring, many Continental

employees, including Vigil, ceased their employment with

Continental and became employees of ExpressJet.[2]

    Vigil received a copy of ExpressJet's employee handbook (the

"handbook") when he became the General Manager of ExpressJet's

station at the Burlington International Airport.  Because this

handbook forms the basis of Vigil's breach of contract claim, it

is necessary to discuss several relevant provisions.  First and

foremost, the handbook states: "YOU SHOULD KNOW THAT . . . This

Employee Handbook is not a contract of employment, and does not

create contractual obligations or rights."  (Paper 38-4 at 4).

The section of the handbook relied upon by Vigil for his

_____

    [1]The following facts are undisputed unless noted otherwise.

    [2]Despite initially admitting he was no longer employed by
Continental as of April 2002, (Paper 39-4 at 1), Vigil now
disputes that his employment with Continental ceased, asserting
that Continental remained a minority shareholder of ExpressJet
and continued to assume obligations under ERISA based upon
Vigil's participation in the Continental Airlines Retirement Plan
("CARP").

contractual claim is entitled "PERFORMANCE IMPROVEMENT PROCESS"
and "is designed to promote a supportive environment that
emphasizes employee involvement and development."  (Paper 38-4 at
17).  Under this section, "[w]henever the circumstances warrant
it, a supervisor may by-pass a performance improvement option and
accelerate disciplinary action, up to and including termination
of employment."  (Paper 38-4 at 17).  The handbook follows with
options for resolving performance issues such as "coaching for
success/improvement," "informal counseling/verbal warning,"
"written warning," "termination warning letter," "disciplinary or
investigative suspensions," and "termination of employment."
(Paper 38-4 at 17-18).  This section of the handbook concludes by
explaining that "[i]n addition to disciplinary terminations, the
Company may discharge employees at will."  (Paper 38-4 at 18).

     At his deposition, Vigil stated that he understood the
handbook was not a contract with ExpressJet, (Paper 39-2, Tr.
38:2-4), but later amended that answer to: "As I said in my
previous answers, I don't recall reading this handbook previously
but I agree that this is what it says."  (Paper 47, Ex. 2).
Vigil also understood that the progressive discipline policy
afforded supervisors the discretion to skip any or all steps of
progressive discipline and, as a manager, had himself by-passed
progressive discipline twice in situations where employees - one
who had operated machinery while intoxicated and the other who

had fraudulently falsified time cards - were summarily

terminated.  (Paper 47 at 3-4).

     B.    <u>Circumstances surrounding Vigil's termination</u>

By late summer of 2002, there is evidence that ExpressJet

was not pleased with Vigil's job performance.  Specifically, in

an August 8, 2002 inter-office memo received by Vigil, Vice

President Chuck Coble ("Coble") expressed, among other things,

that he was: "professionally and personally embarrassed by

[Vigil's] lack of interest and involvement"; "dismayed" at

Vigil's and his staff's unfamiliarity with a particular device

related to aircraft damage; and concerned that several of Vigil's

employees had complained about Vigil's work ethic, the amount of

time he spent in the office, and the possibility that Vigil had

"lost interest."  (Paper 36-2).  In conclusion, Coble stated:

> Art, I have known and worked with you for a long time.  You
> have forgotten more than many of our General Managers know.
> You are quite capable of managing BTV or any other location
> in our system.  The key, however, is your desire to engage
> in whatever it is you do.  I have asked Ewan and Avilene to
> sit down with you in their upcoming visit and help you
> develop an action plan to get you back on course.  Your
> commitment to this process is of paramount importance and I
> urge you to recognize the importance we are placing on it.

(Paper 36-2).  Vigil understood this memo to be a warning about

his job, that Coble was going to implement an important action

plan for Vigil, and unless things improved, Vigil's job was in

jeopardy.  (Paper 39-2, Tr. 55:17-56:14).

It appears disputed whether Ewan Barr ("Barr"), an ExpressJet regional director, actually followed through with Coble's memo by orally counseling Vigil. Vigil testified he could not recall such counseling, while Barr states that such counseling occurred on two occasions - one discussion was related to Vigil's display in the workplace of certain "Dilbert cartoons" and a poster containing "blonde jokes"; the other was related to Vigil's failure to attend meetings and was prompted by an e-mail sent by Karen Miles ("Miles") to Coble, dated November 21, 2003, discussing Vigil's non-attendance.[3]  (Paper 36-12, ¶10).

Vigil's performance evaluations for the end of 2002 and first half of 2003 were less critical - "On Target" and "On Target Minus" (Paper 47, Ex. 3), but in 2004 his superiors again indicated their displeasure. In March of that year, Jay Perez ("Perez"), a member of ExpressJet's senior management, visited the Burlington airport to attend a scheduled meeting organized by Vigil. (Paper 36-4). After the meeting, several ExpressJet employees privately approached Perez and aired several complaints about Vigil. As summarized in an April 30, 2004 e-mail Perez sent to Barr and others, the employees complained:

- The majority of the work force is fed up with the management in BTV, specifically Art Vigil.

---

[3]It is undisputed Vigil posted Dilbert cartoons and a blonde joke poster in the workplace, and that Miles sent the e-mail concerning Vigil's non-attendance.

- Mr. Vigil shows favoritism and let's [sic] some people[,] specifically his female Supervisor[,] work when she wants.
- Two supervisors resigned because of the lack of respect and favoritism Mr. Vigil has shown.
- Mr. Vigil is often missing from work or leaves early.
- [The employees] believe Mr. Vigil has had a mid-life crisis and hasn't been the same since.
- The group has lost total respect for Mr. Vigil and wants something done immediately.
- [The employees] also felt they couldn't go to [Coble] because [Coble was] friends with Mr. Vigil.

(Paper 36-4).

Employee complaints did not stop there.  The following month, Barr received an e-mail from an airport sales agent at the Burlington station entitled "WE NEED HELP."  (Paper 36-5).  The e-mail set forth a host of complaints about a manager that Barr identified as Vigil.  (Paper 36-12, ¶12).

In response to these documented complaints and ongoing concerns about Vigil's job performance, on May 11 and 12, 2004, John Schrage ("Schrage") and Aniccia Miller ("Miller"), representatives of ExpressJet's senior management, interviewed employees working under Vigil at the Burlington station.  (Paper 36-12, ¶13).  These interviews unearthed several disturbing facts, including: (1) an anonymous letter from "a group of concerned ExpressJet agents at Burlington airport" explaining, among other things, that Vigil was responsible for a decrease in morale "to an abysmal low," (Paper 36-7); and (2) allegations that Vigil had misappropriated a Kubota tractor belonging to ExpressJet, made misrepresentations about the tractor to

auditors, and had caused airline tickets to be issued

fraudulently and in violation of ExpressJet's policies.  (Paper

36-12, ¶15).  The misappropriation and fraud allegations prompted

ExpressJet to launch an internal investigation by its corporate

security department.  (Paper 36-12, ¶15).

On May 12, 2004, ExpressJet officials immediately met with

Vigil at the Continental Airlines VIP Club in Houston, Texas and,

according to ExpressJet, notified Vigil that it had decided to

terminate his employment effective May 31, 2004.  (Paper 36-12,

¶16; Paper 38-1, ¶¶6-7).  According to Vigil, at the May 12, 2004

meeting, ExpressJet officials discussed terminating his position

as of June 1, 2004, but also discussed relocating him within the

company.  (Paper 47, Ex. 1).  Nevertheless, Vigil admits that

when he "inquired about the transfer" at the meeting, he received

an "immediate negative response in that there was nothing

available at that particular time."  (Paper 39-3, Tr. 125:14-17).

Thus, Vigil left the meeting with the understanding that: "my

chances were taking [a severance] package, which I had not seen

yet or – it sounded like termination, although the word was never

really used."  (Paper 39-3, Tr. 125:17-20).  Vigil further

understood that after the May 12, 2004 meeting, "there was

supposed to be a resolution by the end of the month."  (Paper 39-

3, Tr. 125:23-24).

On May 20, 2004, ExpressJet sent a proposed severance agreement to Vigil that expressed its desire to end the employer/employee relationship with Vigil and provided that Vigil would resign on May 31, 2004.  (Paper 47, Ex. 1).  On May 26, 2004, Vigil sent an e-mail to Barr explaining he had reviewed the severance package with an attorney and was advised that "the circumstances of my situation appear to be age discrimination." (Paper 47, Ex. 4).  Miles responded to Vigil's e-mail the same day, suggesting they could meet to discuss what would be in the termination letter and why Vigil was being offered the particular amount in his severance package.  (Paper 47, Ex. 4).  On June 1, 2004, ExpressJet sent the then fifty-year old Vigil his termination letter, reciting the numerous complaints dating back to 2002, Vigil's counseling with Barr, Vigil's attendance at a leadership training event entitled "With all due respect," as well as the substantiated allegations of misappropriation and fraud.  (Paper 47, Ex. 5).[4]  The decision-makers involved in terminating Vigil - Barr, Coble, and Miles - were all over the

---

[4]Although the corporate security department did not issue its final report until July 2, 2004, (Paper 36-9), as of June 1, 2004, ExpressJet had received "sufficient information to further substantiate the allegations regarding the Kubota Tractor and fraudulently issued tickets."  (Paper 36-12, ¶17; Paper 38-1, ¶8).
    Vigil maintains that the tickets were given away with Northwest Airlines' approval and that the tractor had been scrapped by ExpressJet in 2001 and then bought by Vigil from the junk dealer for $150.00.  (Paper 47 at 8).

age of forty and members of the protected class.[5] (Paper 38-1,
¶¶6, 11).

Vigil was replaced as general manager of the Burlington
station by a man twenty-nine years of age.  The performance of
the Burlington station has improved dramatically since Vigil's
termination under the new general manager's supervision.  (Paper
36-12, ¶20).

III. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  <u>World Trade Ctr.
Props., L.L.C. v. Hartford Fire Ins.</u>, 345 F.3d 154, 165 (2d Cir.
2003).  The burden is on the moving party to demonstrate there
are no material facts genuinely in dispute.  <u>See</u> <u>Feingold v. New
York</u>, 366 F.3d 138, 148 (2d Cir. 2004) (citing <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 325 (1986)).  When ruling on a motion for
summary judgment, the Court must view the facts and all
inferences to be drawn therefrom in the light most favorable to
the party opposing the motion.  <u>See</u> <u>Johnson v. Wright</u>, 412 F.3d
398, 403 (2d Cir. 2005).

---

[5]Vigil disputes that Barr, Coble, and Miles were the only
decision-makers involved but has offered no evidence in support.

In order to defeat a defendant's properly supported motion
for summary judgment in an employment discrimination action, a
plaintiff must show that there is a material issue of fact as to
whether the employee's protected status was a motivating factor
in the adverse employment action.  See Cronin v. Aetna Life Ins.
Co., 46 F.3d 196, 203 (2d Cir. 1995).  But courts must exercise
caution in such cases because employment discrimination actions
oftentimes present factual issues as to discriminatory intent
that are not properly resolved at the summary judgment stage.
Id.  For this reason, summary judgment should be granted for a
defendant only when the employer has proffered evidence of a
legitimate, nondiscriminatory reason for its action which raises
"no genuine issue and which no rational trier of fact could
reject."  Id.

IV.   Discussion

     A.    Counts I and III: Age Discrimination

     Counts I and III allege age discrimination in violation of
the ADEA and VFEPA.  Claims under the ADEA and VFEPA are analyzed
under the same standards, burdens of proof, and framework as
Title VII.  See Green v. Vermont Country Store, 191 F. Supp. 2d
476, 482-83 (D. Vt. 2002) (citations omitted).  Thus, under the
three-part burden shifting framework, Vigil "must first establish
a prima facie case of age discrimination," Abdu-Brisson v. Delta
Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (citing

10

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)),
which means Vigil must show: (1) he was in the protected age
group; (2) he was qualified for the job; (3) he was terminated;
and (4) the circumstances surrounding his termination permit an
inference of age discrimination.  See Green, 191 F. Supp. 2d at
483 (citations omitted).   If he is able to do this, Defendants
are "required to offer a legitimate, nondiscriminatory business
rationale for its actions."  Id. (citations omitted).  "If
[Defendants are] able to articulate such a reason, the
presumption of age discrimination dissolves, and the burden
shifts back to [Vigil] to prove that [Defendants'] stated reasons
are merely pretextual and that age discrimination was the true
reason for the adverse employment action."  Id. (citations
omitted).

        1.    Defendants' burden of production

    For purposes of their motion, Defendants concede that Vigil
has set forth a prima facie case of age discrimination.  The
Court, therefore, turns to Defendants' burden to show a
legitimate, nondiscriminatory reason for terminating Vigil.
Defendants pass this test with flying colors by identifying and
presenting evidence of job performance issues, employee
complaints, and violations of company policy occurring from 2002
to 2004, including: (1) the August 8, 2002 Coble memo warning
Vigil of a number of performance issues and explaining that Coble

had asked Barr to sit down with Vigil to develop a plan to get

Vigil "on course"; (2) performance evaluations turning from "On

Target" in 2002 to "On Target Minus" for the first half of 2003;

(3) Perez's e-mail to Barr explaining that in March of 2004, a

number of employees had privately voiced complaints to him about

Vigil; (4) the May 2003 e-mail Barr received from a Burlington

station employee entitled "WE NEED HELP" which set forth various

complaints about Vigil; (5) the anonymous letter complaining

about Vigil written by "a group of concerned ExpressJet agents at

Burlington airport"; and (6) the employee allegations of

misappropriation and fraud that were eventually found to be true

by the corporate security department's investigation.

Vigil's response is to dispute the truth of the complaints

and allegations and, without a developed argument, summarily

label them as inadmissible hearsay.  The information contained in

the documents, however, is presented by Defendants not for the

truth of the matter asserted, but instead to show that ExpressJet

was aware of the complaints and allegations and as evidence of

ExpressJet's motivation in acting the way it did.  See Fed. R.

Evid. 801(c).

2.   Pretext

Having met their burden of production, Defendants have burst

the presumption of discrimination and the burden now shifts back

to Vigil to show that Defendants' proffered reasons were not

their true reasons, but merely a pretext for discrimination.   To

meet his burden, Vigil relies in large part on comments allegedly

made to him at some point by another ExpressJet general manager

named Karen Moczulski ("Moczulski").   (Paper 39-2 at 11).

According to Vigil, he was in Houston socializing with Jim

Harrison ("Harrison"), an ExpressJet regional manager in

Louisiana who, like Vigil, was over forty years old, a CARP

participant, and eventually was terminated by ExpressJet in 2002.

While conversing, Vigil and Harrison were approached by Moczulski

who allegedly stated, "you old Continental guys need to keep a

low profile."   (Paper 39-2 at 11).   When Vigil asked why,

Moczulski allegedly responded, "you guys who are still in CARP

are being discussed around the hallways in headquarters."   (Paper

39-2 at 11).

     Upon reviewing Moczulski's statements in the light most

favorable to Vigil, the Court concludes they do not bear the

weight Vigil attempts to place on them.   The statements were made

by a fellow general manager who had absolutely no decision making

authority related to Vigil's employment and who was not involved

in Vigil's termination.   Furthermore, it is entirely unclear when

these alleged comments were made.[6]   These statements constitute

---

[6]Although Vigil testified at his deposition that it was in
the fall of 2003, (Paper 39-2, Tr. 41:12-13), this seems
inconsistent with the fact that Harrison was discharged by
ExpressJet in March 2002.   (Paper 47 at 9).

no "more than stray remarks, statements by non-decisionmakers, and evidence unrelated to the decisional process" and are hardly probative of age discrimination on Defendants' part.  Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1178 (2d Cir. 1992) (internal quotation marks and citations omitted).

Nor do these stray remarks made by a non-decision maker "bear a more ominous significance when considered within the totality of all the evidence."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (internal quotation marks and citations omitted).  Vigil unconvincingly attempts to use what happened to Harrison as evidence of age discrimination based upon his theory that Defendants were systematically terminating employees who were CARP participants "because their CARP pension benefits provided them with a financial 'safety net' after their termination."  (Paper 46 at 6).  But terminating employees who are participants in a retirement plan would be a decision motivated by a factor correlated with age, not wholly motivated by age.  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993).  Although such a practice may be unlawful under ERISA, it is not under the ADEA and VFEPA, and no ERISA claims have been pled in this case.

Without presenting affirmative evidence, Vigil also tries to show pretext by claiming spoliation of records, failure to maintain records, and arguing that Defendants failed to follow

their own progressive discipline practice.  In so doing, however,

Vigil seems to ignore that it is his burden to establish pretext,

not the Defendants' burden to disprove it.  See Evans v. Port

Auth. of New York and New Jersey, 192 F. Supp. 2d 247, 275

(S.D.N.Y. 2002).  Vigil has failed to present any evidence of

spoliation or evidence that individuals similarly situated were

treated differently.  In fact, it is undisputed the handbook

affords considerable discretion to terminate an employee whenever

warranted by the circumstances.  Vigil himself had on two

occasions been involved with the summary dismissal of two

employees without following any steps of progressive discipline.

Further, despite Vigil's assertions to the contrary, there is

consistent documented evidence over the course of two years of

his declining job performance, at least one warning sent by

management to him, numerous employee complaints about him, and

his involvement in serious matters of misappropriation and fraud.

      Finally, Vigil alludes to retaliation by trumpeting the fact

that his effective date of termination, June 1, 2004, occurred

only seven days after Vigil referred to age discrimination in his

May 26, 2004 e-mail sent to Miles.  But, there is no retaliation

claim pled in Vigil's complaint and he cannot, at this point,

amend his complaint to add one.  To the extent this argument is

to show pretext, the Court finds it unavailing because it is

undisputed that as of the May 12, 2004 meeting, Vigil understood

ExpressJet was, at a minimum, seriously considering terminating

his employment, had negatively responded to Vigil's request for a

transfer, and would resolve the issue of his

termination/severance package by the end of May 2004.  And, by

virtue of his receipt of the proposed severance agreement on May

20, 2004, Vigil was on notice that ExpressJet wished to end their

employment relationship effective June 1, 2004.

Having engaged in the "case-by-case" examination of the

record in its entirety, see Slattery v. Swiss Reins. Am. Corp.,

248 F.3d 87, 93 (2d Cir. 2001), the Court concludes that although

not dispositive in their own right, several facts support the

notion that age discrimination was not a factor in Defendants'

decision to terminate Vigil: (1) the statistics submitted by

ExpressJet reveal that ExpressJet retained more general managers

over the age of forty than under the age of forty (of the fifty-

five general managers employed by ExpressJet as of June 1, 2004,

thirty-two were over the age of forty), (Paper 38-1, ¶¶12-13),

and that between 2002 and June 1, 2004, more general managers

under the age of forty left employment with ExpressJet than did

general managers over the age of forty (nine of the twenty-four

general managers that left employment with ExpressJet during this

time were over the age of forty), (Paper 38-1, ¶¶14-15); (2) the

decision-makers involved in terminating Vigil - Barr, Coble, and

Miles - were all over the age of forty and members of the

protected class, (Paper 38-1, ¶¶6, 11); and (3) under the objective standards employed by ExpressJet to assess station performance, the performance of the Burlington station has improved dramatically since Vigil's termination under the new general manager's supervision.  (Paper 36-12, ¶20).

In sum, despite the benefits of discovery, Vigil's age discrimination claims meet their Waterloo because Vigil has failed to set forth meaningful evidence to show that Defendants' proffered reasons were merely a pretext and that age was the motivating factor behind Defendants' decision to terminate his employment.

B.    Count II: Breach of implied contract

Vigil's second claim is that ExpressJet's handbook created an implied contract to use progressive discipline and that ExpressJet's failure to do so was a breach of that contract.

The Court concludes that this claim too is incapable of surviving summary judgment.  For one, the policies cited by Vigil do not constitute "definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations[.]"  Ross v. Times Mirror, Inc., 164 Vt. 13, 20 (1995).  Although Vigil relies on Dillon v. Champion Jogbra, Inc., 175 Vt. 1 (2002) in support of his claim, the handbook provisions at issue in this case are far from the "elaborate system governing employee discipline and discharge" at issue in

<u>Dillon</u>.   175 Vt. at 7.   There, the Vermont Supreme Court

addressed a manual that required management to use training and

counseling, established three categories of violations of company

policy, and delineated progressive steps to take for certain

types of cases and time periods governing things such as how long

a reprimand was considered active.   <u>See</u> <u>id.</u> at 8.   ExpressJet's

handbook, in contrast, merely sets forth options for resolving

performance issues, expressly leaves choice of the particular

option to the supervisor's discretion, and allows supervisors to

by-pass options up to and including termination.   As such, the

Court finds that the handbook does not offer an enforceable

promise to terminate an employee only after following a certain

disciplinary procedure.   Any company training Vigil received

about applying policies in a fair and consistent manner

constitute no more than general policy statements that are

insufficient to create a contract.[7]   <u>See</u> <u>Ross</u>, 164 Vt. at 20.

Even if the cited portion of the handbook created an implied

contract, Vigil is unable to establish a breach as a matter of

law because the undisputed evidence is that ExpressJet

management, utilizing its discretion as unambiguously set forth

in the handbook, sent Vigil a written warning about his

performance, and ultimately terminated Vigil in light of a flurry

---

[7]Moreover, it cannot be ignored that Vigil initially
admitted that his understanding of the handbook aligned with the
handbook's visible disclaimer that it was not a contract.

of documented employee complaints and substantiated allegations of fraud and misappropriation.  In addition to being consistent with the express terms of the handbook, ExpressJet's actions are consistent with Vigil's own experience as an ExpressJet manager. He understood supervisors could use discretion to skip steps of progressive discipline when warranted by the circumstances, and in two instances, had been involved in by-passing performance improvement options and summarily dismissing employees, one of whom had fraudulently submitted falsified time cards.  While Vigil testified that he was trained as a manager to apply the personnel policies in a fair and consistent manner, there is no evidence that remotely tends to show ExpressJet's treatment of Vigil ran afoul of a company-wide practice.

### C.    Continental

The Court finds no evidence has been presented that once ExpressJet became its own entity, Continental continued any kind of employer/employee relationship with Vigil, was in any way linked to ExpressJet's handbook, or participated in ExpressJet's decision to terminate Vigil.  Vigil also has not alleged, nor shown, that Continental is part of an "integrated enterprise" with ExpressJet.  See Parker v. Columbia Pictures Inds., 204 F.3d 326, 341 (2d Cir. 2000).  The mere fact that Continental may have had ERISA obligations to Vigil during the relevant time period is

not enough.  Nor is the fact that ExpressJet representatives met with Vigil at Continental's VIP club at the Houston airport.

Accordingly, Continental is entitled to summary judgment on this basis, as well as for the reasons previously discussed in this ruling.

V.     Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, (Paper 33), is GRANTED on all counts.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 13th day November, 2006.


                                    /s/ J. Garvan Murtha
                                    J. Garvan Murtha
                                    United States District Judge